# MUNRO, SECRETARY OF STATE OF WASHINGTON *v.* SOCIALIST WORKERS PARTY ET AL.

No. 85-656.   Argued October 7, 1986—Decided December 10, 1986

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and BLACKMUN, POWELL, STEVENS, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post,* p. 200.

*James M. Johnson,* Senior Assistant Attorney General of Washington, argued the cause for appellant. With him on the briefs were *Kenneth O. Eikenberry,* Attorney General, *Edward B. Mackie,* Chief Deputy Attorney General, and *Timothy R. Malone,* Assistant Attorney General.

*Daniel Hoyt Smith* argued the cause and filed a brief for appellees.*

JUSTICE WHITE delivered the opinion of the Court.

The State of Washington requires that a minor-party candidate for partisan office receive at least 1% of all votes cast for that office in the State's primary election before the candidate's name will be placed on the general election ballot. The question for decision is whether this statutory require-

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union Foundation et al. by *Jack D. Novik, Burt Neuborne* and *David J. Burman;* and for the Libertarian Party of Washington by *James J. Featherstone* and *Richard E. Gardiner.*

ment, as applied to candidates for statewide offices, violates the First and Fourteenth Amendments to the United States Constitution. The Court of Appeals for the Ninth Circuit declared the provision unconstitutional. 765 F. 2d 1417 (1985). We reverse.

In 1977, the State of Washington enacted amendments to its election laws, changing the manner in which candidates from minor political parties qualify for placement on the general election ballot. Before the amendments, a minor-party candidate did not participate in the State's primary elections, but rather sought his or her party's nomination at a party convention held on the same day as the primary election for "major" parties.[1] The convention-nominated, minor-party candidate secured a position on the general election ballot upon the filing of a certificate signed by at least 100 registered voters who had participated in the convention and who had not voted in the primary election.[2] The 1977 amendments retained the requirement that a minor-party candidate be nominated by convention,[3] but imposed the additional requirement that, as a precondition to general ballot access, the nominee for an office appear on the primary election ballot and receive at least 1% of all votes cast for that particular of-

---

[1] Wash. Rev. Code § 29.24.020 (1976). A "major" political party was defined as "a political party of which at least one nominee received at least ten percent of the total vote cast at the last preceding state-wide general election . . . ." § 29.01.090(1). This section's 10% requirement was amended in 1977 to 5%. § 29.01.090. A "minor" political party is "a political organization other than a major political party." § 29.01.100.

[2] § 29.24.040.

[3] § 29.24.020. Section 29.24.030(1) provides:

"To be valid, a convention must:

"(1) Be attended by at least a number of individuals who are registered to vote in the election jurisdiction for which nominations are to be made, which number is equal to one for each ten thousand voters or portion thereof who voted in the last preceding presidential election held in the election jurisdiction or twenty-five such registered voters, whichever number is greater . . . ."

Appellees did not challenge this requirement in the courts below.

fice at the primary election. Wash. Rev. Code § 29.18.110 (1985).[4]

Washington conducts a "blanket primary" at which registered voters may vote for any candidate of their choice, irrespective of the candidates' political party affiliation.[5] A candidate seeking placement on the primary election ballot must declare his candidacy no earlier than the last Monday in July, and no later than the following Friday.[6] Minor-party nominating conventions are to be held on the Saturday preceding this filing period.[7] The primary election is held on the third Tuesday in September.[8]

The events giving rise to this action occurred in 1983, after the state legislature authorized a special primary election to be held on October 11, 1983, to fill a vacancy in the office of United States Senator. Appellee Dean Peoples qualified to be placed on the primary election ballot as the nominee of appellee Socialist Workers Party (Party). Also appearing on that ballot were 32 other candidates. At the primary, Mr. Peoples received approximately nine one-hundredths of one percent of the total votes cast for the office,[9] and, accordingly, the State did not place his name on the general election ballot.

Appellees (Peoples, the Party, and two registered voters) commenced this action in United States District Court, alleging that § 29.18.110 abridged their rights secured by the First

---

[4] Section 29.18.110 provides:

"No name of a candidate for a partisan office shall appear on the general election ballot unless he receives a number of votes equal to at least one percent of the total number cast for all candidates for the position sought: *Provided*, That only the name of the candidate who receives a plurality of the votes cast for the candidates of his party for any office shall appear on the general election ballot."

[5] § 29.18.200.

[6] § 29.18.025.

[7] § 29.24.020.

[8] § 29.13.070.

[9] Mr. Peoples received 596 of the 681,690 votes cast in the primary.

and Fourteenth Amendments. The District Court entered judgment denying appellees relief, but the Court of Appeals for the Ninth Circuit reversed, holding that § 29.18.110, as applied to candidates for statewide offices, was unconstitutional. The State filed a timely appeal with this Court, and we noted probable jurisdiction. 474 U. S. 1049 (1986).

Restrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively, *Williams* v. *Rhodes,* 393 U. S. 23, 30 (1968), and may not survive scrutiny under the First and Fourteenth Amendments. In *Williams* v. *Rhodes,* for example, we held unconstitutional the election laws of Ohio insofar as in combination they made it virtually impossible for a new political party to be placed on the ballot, even if the party had hundreds of thousands of adherents. These associational rights, however, are not absolute and are necessarily subject to qualification if elections are to be run fairly and effectively. *Storer* v. *Brown,* 415 U. S. 724, 730 (1974).

While there is no "litmus-paper test" for deciding a case like this, *ibid.,* it is now clear that States may condition access to the general election ballot by a minor-party or independent candidate upon a showing of a modicum of support among the potential voters for the office. In *Jenness* v. *Fortson,* 403 U. S. 431 (1971), the Court unanimously rejected a challenge to Georgia's election statutes that required independent candidates and minor-party candidates, in order to be listed on the general election ballot, to submit petitions signed by at least 5% of the voters eligible to vote in the last election for the office in question. Primary elections were held only for those political organizations whose candidate received 20% or more of the vote at the last gubernatorial or Presidential election. The Court's opinion observed that "[t]here is surely an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's can-

didate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.,* at 442. And, in *American Party of Texas* v. *White,* 415 U. S. 767 (1974), candidates of minor political parties in Texas were required to demonstrate support by persons numbering at least 1% of the total vote cast for Governor at the last preceding general election. Candidates could secure the requisite number of petition signatures at precinct nominating conventions and by supplemental petitions following the conventions. Voters signing these supplemental petitions had to swear under oath that they had not participated in another party's primary election or nominating process. In rejecting a First Amendment challenge to the 1% requirement, we asserted that the State's interest in preserving the integrity of the electoral process and in regulating the number of candidates on the ballot was compelling and reiterated the holding in *Jenness* that a State may require a preliminary showing of significant support before placing a candidate on the general election ballot. *American Party of Texas* v. *White, supra,* at 782, n. 14.

*Jenness* and *American Party* establish with unmistakable clarity that States have an "undoubted right to require candidates to make a preliminary showing of substantial support in order to qualify for a place on the ballot . . . ." *Anderson* v. *Celebrezze,* 460 U. S. 780, 788–789, n. 9 (1983). We reaffirm that principle today.

The Court of Appeals determined that Washington's interest in insuring that candidates had sufficient community support did not justify the enactment of § 29.18.110 because "Washington's political history evidences no voter confusion from ballot overcrowding." 765 F. 2d, at 1420. We accept this historical fact, but it does not require invalidation of § 29.18.110.

We have never required a State to make a particularized showing of the existence of voter confusion, ballot over-

crowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access. In *Jenness* v. *Fortson, supra,* we conducted no inquiry into the sufficiency and quantum of the data supporting the reasons for Georgia's 5% petition-signature requirement. In *American Party of Texas* v. *White, supra,* we upheld the 1% petition-signature requirement, asserting that the "State's admittedly vital interests are sufficiently implicated to insist that political parties appearing on the general ballot demonstrate a significant, measurable quantum of community support." *Id.,* at 782. And, in *Storer* v. *Brown, supra,* we upheld California's statutory provisions that denied ballot access to an independent candidate if the candidate had been affiliated with any political party within one year prior to the immediately preceding primary election. We recognized that California had a "compelling" interest in maintaining the integrity of its political processes, and that the disaffiliation requirement furthered this interest and was therefore valid, even though it was an absolute bar to attaining a ballot position. We asserted that "[i]t appears obvious to us that the one-year disaffiliation provision furthers the State's interest in the stability of its political system." *Id.,* at 736. There is no indication that we held California to the burden of demonstrating empirically the objective effects on political stability that were produced by the 1-year disaffiliation requirement.

To require States to prove actual voter confusion, ballot overcrowding, or the presence of frivolous candidacies as a predicate to the imposition of reasonable ballot access restrictions would invariably lead to endless court battles over the sufficiency of the "evidence" marshaled by a State to prove the predicate. Such a requirement would necessitate that a State's political system sustain some level of damage before the legislature could take corrective action. Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than re-

actively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.

In any event, the record here suggests that revision of § 29.18.110 was, in fact, linked to the state legislature's perception that the general election ballot was becoming cluttered with candidates from minor parties who did not command significant voter support. In 1976, one year prior to revision of § 29.18.110, the largest number of minor political parties in Washington's history—12—appeared on the general election ballot. The record demonstrates that at least part of the legislative impetus for revision of § 29.18.110 was concern about minor parties having such easy access to Washington's general election ballot.[10]

The primary election in Washington, like its counterpart in California, is "an integral part of the entire election process . . . [that] functions to winnow out and finally reject all but the chosen candidates." Storer v. Brown, 415 U. S., at 735. We think that the State can properly reserve the general election ballot "for major struggles," ibid., by conditioning access to that ballot on a showing of a modicum of voter support. In this respect, the fact that the State is willing to have a long and complicated ballot at the primary provides no measure of what it may require for access to the general election ballot. The State of Washington was clearly entitled to raise the ante for ballot access, to simplify the general election ballot, and to avoid the possibility of unrestrained factionalism at the general election. See id., at 736.

Neither do we agree with the Court of Appeals and appellees that the burdens imposed on appellees' First Amendment rights by the 1977 amendments are far too severe to be justified by the State's interest in restricting access to the general ballot. Much is made of the fact that prior to 1977, virtually every minor-party candidate who sought general election ballot position so qualified, while since 1977 only 1

---

[10] Memorandum from the Office of the Secretary of State to the legislature's Conference Committee, App. A to Reply Brief for Appellant.

out of 12 minor-party candidates has appeared on that ballot. Such historical facts are relevant, but they prove very little in this case, other than the fact that § 29.18.110 does not provide an insuperable barrier to minor-party ballot access.[11]  It is hardly a surprise that minor parties appeared on the general election ballot before § 29.18.110 was revised; for, until then, there were virtually no restrictions on access.  Under our cases, however, Washington was not required to afford such automatic access and would have been entitled to insist on a more substantial showing of voter support.  Comparing the actual experience before and after 1977 tells us nothing about how minor parties would have fared in those earlier years had Washington conditioned ballot access to the maximum extent permitted by the Constitution.

Appellees urge that this case differs substantially from our previous cases because requiring primary votes to qualify for a position on the general election ballot is qualitatively more restrictive than requiring signatures on a nominating petition.  In effect, their submission would foreclose any use of the primary election to determine a minor party's qualification for the general ballot.  We are unpersuaded, however, that the differences between the two mechanisms are of constitutional dimension.  Because Washington provides a "blanket primary," minor-party candidates can campaign among the entire pool of registered voters.  Effort and resources that would otherwise be directed at securing petition signatures can instead be channeled into campaigns to "get the vote out," foster candidate name recognition, and educate the electorate.  To be sure, candidates must demonstrate, through their ability to secure votes at the primary election, that they enjoy a modicum of community support in order to

---

[11] Section 29.18.110 apparently poses an insubstantial obstacle to minor-party candidates for nonstatewide offices and independent candidates for statewide offices.  Since 1977, 36 out of 40 such minor-party candidates have qualified for the general election ballot and 4 out of 5 independent candidates for statewide office have so qualified.

advance to the general election. But requiring candidates to demonstrate such support is precisely what we have held States are permitted to do.

Appellees argue that voter turnout at primary elections is generally lower than the turnout at general elections, and therefore enactment of § 29.18.110 has reduced the pool of potential supporters from which Party candidates can secure 1% of the vote. We perceive no more force to this argument than we would with an argument by a losing candidate that his supporters' constitutional rights were infringed by their failure to participate in the election. Washington has created no impediment to voting at the primary elections; every supporter of the Party in the State is free to cast his or her ballot for the Party's candidates. As was the case in *Jenness* v. *Fortson*, 403 U. S. 431 (1971), "candidates and members of small or newly formed political organizations are wholly free to associate, to proselytize, to speak, to write, and to organize campaigns for any school of thought they wish. . . ." *Id.*, at 438. States are not burdened with a constitutional imperative to reduce voter apathy or to "handicap" an unpopular candidate to increase the likelihood that the candidate will gain access to the general election ballot. As we see it, Washington has done no more than to visit on a candidate a requirement to show a "significant modicum" of voter support, and it was entitled to require that showing in its primary elections.

We also observe that § 29.18.110 is more accommodating of First Amendment rights and values than were the statutes we upheld in *Jenness*, *American Party*, and *Storer*. Under each scheme analyzed in those cases, if a candidate failed to satisfy the qualifying criteria, the State's voters had no opportunity to cast a ballot for that candidate and the candidate had no ballot-connected campaign platform from which to espouse his or her views; the unsatisfied qualifying criteria served as an absolute bar to ballot access. Undeniably, such restrictions raise concerns of constitutional dimension, for

the "exclusion of candidates . . . burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day . . . ." *Anderson* v. *Celebrezze*, 460 U. S., at 787–788. Here, however, Washington virtually guarantees what the parties challenging the Georgia, Texas, and California election laws so vigorously sought—candidate access to a statewide ballot. This is a significant difference. Washington has chosen a vehicle by which minor-party candidates must demonstrate voter support that serves to promote the very First Amendment values that are threatened by overly burdensome ballot access restrictions. It can hardly be said that Washington's voters are denied freedom of association because they must channel their expressive activity into a campaign at the primary as opposed to the general election. It is true that voters must make choices as they vote at the primary, but there are no state-imposed obstacles impairing voters in the exercise of their choices. Washington simply has not substantially burdened the "availability of political opportunity." *Lubin* v. *Panish*, 415 U. S. 709, 716 (1974).

*Jenness* and *American Party* rejected challenges to ballot access restrictions that were based on a candidate's showing of voter support, notwithstanding the fact that the systems operated to foreclose a candidate's access to *any* statewide ballot. Here, because Washington affords a minor-party candidate easy access to the primary election ballot and the opportunity for the candidate to wage a ballot-connected campaign, we conclude that the magnitude of § 29.18.110's effect on constitutional rights is slight when compared to the restrictions we upheld in *Jenness* and *American Party*. Accordingly, Washington did not violate the Constitution by denying appellee Peoples a position on the general election ballot on November 8, 1983.

The judgment of the Court of Appeals for the Ninth Circuit is therefore reversed.

*It is so ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Limitations on ballot access burden two fundamental rights: "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams* v. *Rhodes*, 393 U. S. 23, 30 (1968). These fundamental rights are implicated most clearly where minor-party access to the ballot is restricted. As we noted in *Illinois Board of Elections* v. *Socialist Workers Party*, 440 U. S. 173, 185 (1979), "[t]he States' interest in screening out frivolous candidates must be considered in light of the significant role that third parties have played in the political development of the Nation."

The minor party's often unconventional positions broaden political debate, expand the range of issues with which the electorate is concerned, and influence the positions of the majority, in some instances ultimately becoming majority positions. And its very existence provides an outlet for voters to express dissatisfaction with the candidates or platforms of the major parties. Notwithstanding the crucial role minor parties play in the American political arena, the Court holds today that the associational rights of minor parties and their supporters are not unduly burdened by a ballot access statute that, in practice, completely excludes minor parties from participating in statewide general elections.

I

The Court fails to articulate the level of scrutiny it applies in holding that the Washington 1% primary vote requirement is not an unconstitutional ballot access restriction. While it recognizes that "[r]estrictions upon the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively . . . and may not survive scrutiny under the First and Fourteenth Amendments,"

*ante*, at 193, the Court fails to indicate how much impingement would be too much or how great the State's interest must be to limit ballot access to candidates who have demonstrated a particular level of popular support.

By contrast, the standard of review set forth in our prior decisions is clear: Whether viewed as a burden on the right to associate or as discrimination against minor parties, a provision that burdens minor-party access to the ballot must be necessary to further a compelling state interest, and must be narrowly tailored to achieve that goal. *Illinois Board of Elections* v. *Socialist Workers Party, supra,* at 184; *American Party of Texas* v. *White,* 415 U. S. 767, 780 (1974); *Clements* v. *Fashing,* 457 U. S. 957, 977, n. 2 (1982) (BRENNAN, J., dissenting); see also *id.,* at 964–965 (plurality opinion). The necessity for this approach becomes evident when we consider that major parties, which by definition are ordinarily in control of legislative institutions, may seek to perpetuate themselves at the expense of developing minor parties. The application of strict scrutiny to ballot access restrictions ensures that measures taken to further a State's interest in keeping frivolous candidates off the ballot do not incidentally impose an impermissible bar to minor-party access. See Elder, Access to the Ballot By Political Candidates, 83 Dick. L. Rev. 387, 406 (1979); *Williams* v. *Rhodes, supra,* at 32.

Appellant argues that there is no ballot access limitation here at all, and thus no need for the application of heightened scrutiny, because minor parties can appear on a *primary* ballot simply by meeting reasonable petition requirements. I cannot accept, however, as a general proposition, that access to *any* ballot is always constitutionally adequate. The Court, in concluding here that the State may reserve the general election ballot for "'major struggles,'" *ante*, at 196, quoting *Storer* v. *Brown,* 415 U. S. 724, 735 (1974), appears to acknowledge that, because of its finality, the general election is the arena where issues are sharpened, policies are hotly de-

bated, and the candidates' positions are clarified. Nonetheless, the Court deems access to the primary adequate to satisfy minor-party rights to ballot access, even though we have characterized the primary election principally as a "forum for continuing intraparty feuds," *Storer* v. *Brown, supra,* at 735, rather than an arena for debate on the issues. Access to a primary election ballot is not, in my view, all the access that is due when minor parties are excluded entirely from the general election.[1]

The Court's conclusion stems from a fundamental misconception of the role minor parties play in our constitutional scheme. To conclude that access to a primary ballot is adequate ballot access presumes that minor-party candidates seek only to get elected. But, as discussed earlier, minor-party participation in electoral politics serves to expand and affect political debate. Minor parties thus seek "influence, if not always electoral success." *Illinois Board of Elections* v. *Socialist Workers Party, supra,* at 185–186; cf. *Williams* v. *Rhodes, supra,* at 32 (States may not keep "all political parties off the ballot until they have enough members to win"). Their contribution to "diversity and competition in the marketplace of ideas," *Anderson* v. *Celebrezze,* 460 U. S. 780, 794 (1983), does not inevitably implicate their ability to *win* elections. That contribution cannot be realized if they are unable to participate meaningfully in the phase of the electoral process in which policy choices are most seriously considered. A statutory scheme that excludes minor parties entirely from this phase places an excessive burden on the

---

[1] See *Socialist Workers Party* v. *Secretary of State,* 412 Mich. 571, 317 N. W. 2d 1 (1982), in which the Michigan Supreme Court struck down a statute requiring a showing of voter support at a primary election in order to give new political parties access to the general election ballot. The court found that such "restrictions on access work to eliminate political and ideological alternatives at the time major party candidates are selected and before campaigning has identified and sharpened the issues facing the electorate." *Id.,* at 588, 317 N. W. 2d, at 6–7.

constitutionally protected associational rights of those parties and their adherents.

The Court suggests that any ballot access limitation that merely requires a preliminary showing of support is constitutionally acceptable. *Ante,* at 193. In past cases, however, we have acknowledged only that there is "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Jenness* v. *Fortson,* 403 U. S. 431, 442 (1971). It still remains for the State to demonstrate that the statute is "properly drawn," employing the "least drastic means" to achieve the State's ends. *Illinois Board of Elections* v. *Socialist Workers Party,* 440 U. S., at 185. The State fails, in my opinion, to do so here.

I am unconvinced that the Washington statute serves the asserted justification for the law: avoiding ballot overcrowding and voter confusion. The statute streamlines the general election, where overcrowding and confusion appear never to have been much of a problem before the 1977 amendments, at the expense of an already cumbersome primary ballot. Between 1907 and 1977, no more than six minor-party candidates ever appeared on the general election ballot for any statewide office, and no more than four ever ran for any statewide office other than Governor, suggesting that the ballot was never very crowded. 765 F. 2d 1417, 1420 (CA9 1985); cf. *Williams* v. *Rhodes,* 393 U. S., at 47 (Harlan, J., concurring in result) ("[T]he presence of eight candidacies cannot be said, in light of experience, to carry a significant danger of voter confusion"). But in the 1983 special election that prompted this lawsuit, appellee Peoples, instead of being placed on the general election ballot with 2 other candidates, was placed on the primary ballot along with *32* other

candidates: 18 Democrats and 14 Republicans.    765 F. 2d, at 1420.

The Court notes that we have not previously required a State seeking to impose reasonable ballot access restrictions to make a particularized showing that voter confusion in fact existed before those restrictions were imposed.    *Ante,* at 194–196.    But where the State's solution exacerbates the very problem it claims to solve, the State's means cannot be even rationally related to its asserted ends.

The Court seems not at all troubled by the State's insistence on a clear and unencumbered general election ballot and the State's simultaneous willingness to employ "a long and complicated ballot at the primary." *Ante,* at 196.    The Court evidently deems legitimate the State's decision to befuddle the voters in the only election that now matters to minor-party candidates and their adherents in order to guarantee a negligible increase in ballot clarity at the general election.    Since minor parties are only allowed access to the primary election ballot, the discovery that the State's asserted interest in an uncrowded ballot coincidentally extends only to the general election has constitutional significance. Rather than alleviating the harm the statute purports to prevent, the law simply shifts any possible harm to the primary election, which, deliberately or unintentionally, decreases the prospect of a minor-party candidate for statewide office qualifying for the general election.

Additionally, while a State may have an interest in eliminating frivolous candidates by requiring candidates to demonstrate "a significant modicum of support" to qualify for a place on the ballot, Washington already had a mechanism that required minor-party candidates to show such support, which it retained after its imposition of the 1% primary vote requirement in 1977.    Appellees did not challenge the legitimacy of the convention and petition requirements in this case, but the fact that a mechanism for requiring some showing of support previously existed casts doubt on the need for

the imposition of still another requirement on minor-party candidates. Moreover, the application of the 1% requirement suggests it is overbroad, avoiding frivolous candidacies only by excluding virtually all minor-party candidates from general elections for statewide office.

The only purpose this statute seems narrowly tailored to advance is the impermissible one of protecting the major political parties from competition precisely when that competition would be most meaningful. Because the statute burdens appellees' First Amendment interests, it must be subjected to strict scrutiny; because it fails to pass such scrutiny, it is unconstitutional.

## II

Even if I were prepared to adopt the nebulous logic the Court employs in preference to the mandatory strict standard of review in this case, I could not reach the majority's result. While this Court has in the past acknowledged that limits on minor-party access to the ballot may in some circumstances be appropriate, we have made equally clear that States may not employ ballot access limitations which result in the exclusion of minor parties from the ballot. See *Williams* v. *Rhodes, supra*. "The Constitution requires that access to the electorate be real, not 'merely theoretical.'" *American Party of Texas*, 415 U. S., at 783, quoting *Jenness* v. *Fortson, supra*, at 439.

Under this reasoning, the validity of ballot access limitations is a function of empirical evidence: A minor party is not impermissibly burdened by ballot access restrictions when "a reasonably diligent independent candidate" could be expected to satisfy the ballot access requirement. *Storer* v. *Brown*, 415 U. S., at 742; see *American Party of Texas, supra*, at 784, n. 16. We have therefore sustained restrictions on ballot access where they did not impose "insurmountable obstacles to fledgling political party efforts to generate support among the electorate and to evidence that support within the time allowed." 415 U. S., at 784. In

*American Party of Texas,* we sustained a 1% petition signature requirement because it was apparent that it was, in practice, neither "impossible nor impractical," *id.*, at 783, for minor parties to demonstrate this level of support.   Indeed, two of the minor parties that were plaintiffs in *American Party of Texas* qualified candidates for the general election ballot under the ballot access restrictions there at issue. *Id.*, at 779.   Similarly, in *Jenness* v. *Fortson,* 403 U. S., at 439, we approved Georgia's 5% petition requirement for ballot access, in part relying on the fact that "[t]he open quality of the Georgia system [was] far from merely theoretical" because a candidate for Governor in 1966 and a candidate for President in 1968 had each gained access to the general election ballot through the nominating petition route.

Here, by contrast, Washington's primary law acts as an almost total bar to minor-party access to statewide general election ballots.   Since the revision of Wash. Rev. Code § 29.18.110 in 1977, minor-party candidates have been, in the words of the Court of Appeals, "substantially eliminated from Washington's general election ballot."   765 F. 2d, at 1419. The Court of Appeals found that by 1984, only one minor-party candidate had been able to surmount the 1% barrier and earn the right to participate in the general election. *Ibid.*[2]   The legislation leading to this substantial elimination of minor parties from the political arena in Washington's general elections should not be sustained as a legitimate requirement of a demonstration of significant support.

Since *Williams* v. *Rhodes,* this Court has recognized that state legislation may not ensure the continuing supremacy of the two major parties by precluding minor-party access to the ballot as a practical matter.   Yet here the Court sustains

---

[2] This was the Libertarian candidate for State Treasurer in 1984.   Brief for Appellees 9; App. 145–146.   Neither the Democratic nor Republican candidates were opposed for their party nomination, and no other minor-party candidates participated in the primary.   Sample Primary Election Ballot, Clark County, Washington, Sept. 18, 1984.

a statute that does just that. In doing so, the Court permits a State to pre-empt meaningful participation by minor parties in the political process by requiring them to demonstrate their support in a crowded primary election. The Court thus holds that minor parties may be excised from the electoral process before they have fulfilled their central role in our democratic political tradition: to channel dissent into that process in a constructive fashion. Respectfully, I dissent.