RAINBOW COALITION OF OKLA-HOMA; Floyd Turner, Chairman of the Rainbow Coalition of Oklahoma, Plaintiffs,

and

Libertarian Party of Oklahoma; Charles Burris, Chairman of the Libertarian Party of Oklahoma; Populist Party of Oklahoma, Inc., an Oklahoma non-profit corporation; and Bill Chandler, Chairman of the Populist Party of Oklahoma, Plaintiffs–Appellants,

v.

The OKLAHOMA STATE ELECTION BOARD; Betty McElderry, Chairman of the Oklahoma State Election Board; Angela Ables, Vice Chairman of the Oklahoma State Election Board; Mona Lambird, member of the Oklahoma State Election Board; and Lee Slater, Secretary of the Oklahoma State Election Board, Defendants–Appellees.

No. 87–2360.

United States Court of Appeals, Tenth Circuit.

April 18, 1988.

Thomas L. Spencer, Asst. Atty. Gen. (Robert H. Henry, Atty. Gen. of Oklahoma, with him on the briefs), Oklahoma City, Okl., for defendants-appellees.

James C. Linger, of Butler & Linger, Tulsa, Okl. (Loren L. Baker, Oklahoma City, Okl., with him on the briefs), for plaintiffs-appellants.

Before SEYMOUR and McWILLIAMS, Circuit Judges, SAFFELS *, District Judge.

SEYMOUR, Circuit Judge.

The Rainbow Coalition, Libertarian, and Populist Parties of Oklahoma brought this action against the Oklahoma State Election Board pursuant to 42 U.S.C. § 1983 (1982), asserting that Oklahoma's ballot access and voter registration laws violate their rights under the First and Fourteenth Amendments. Both sides filed motions for summary judgment. The district court ruled in favor of the Board and denied plaintiffs' requested declaratory and injunctive relief. Plaintiffs Libertarian and Populist Parties appeal and we affirm.[1]

Plaintiffs contend that they are denied equal protection under the Oklahoma statute governing the process by which a minority party becomes recognized by the state and thus able to place party candidates on the ballot. Plaintiffs also assert that the deadline for filing petitions seeking recognized party status is too far removed from the primary and general elections to pass constitutional muster, particularly given the high signature requirement for becoming a recognized party. Finally, plaintiffs argue that the election laws unconstitutionally preclude voters from registering as members of unrecognized political parties.

I.

Our consideration of these claims begins with a description of the statutes at issue and their function in the context of the Oklahoma Election Code. The Oklahoma scheme distinguishes between those political parties that are recognized by the state and those that are not.[2] Only recognized parties may identify their candidates on the ballot by party label, and only members of recognized parties may designate their party affiliation when they register to vote. Members of nonrecognized parties are shown on the voter registration rolls as Independents.

A political body desiring to obtain recognized party status must file petitions with the Board "bearing the signatures of registered voters equal to at least five percent (5%) of the total votes cast in the last General Election either for Governor or for electors for President and Vice President." Okla.Stat. tit. 26, § 1–108 (1981 & Supp. 1987).[3] The party has one year to circulate

---

* Honorable Dale E. Saffels, District Court of Kansas, sitting by designation.

1. In its summary judgment motion, the Board contended that the Rainbow Coalition, a plaintiff below, had no standing. The district court agreed, and the Rainbow Coalition has not sought review of this ruling.

2. The state defines recognized political parties as "parties whose candidates' names appeared on the General Election ballot in 1974, and those parties which shall be formed according to law." Okla.Stat. tit. 26, § 1–107 (1981). At present, only the Republican and Democratic parties have recognized status in Oklahoma.

3. Section 1–108 provides:
"A group of persons may form a recognized political party at any time except during the period between July 1 and November 15 of any even-numbered year if the following procedure is observed:
"1. Notice of intent to form a recognized political party must be filed in writing with the Secretary of the State Election Board at any time except during the period between March 1 and November 15 of any even-numbered year.
"2. After said notice is filed, petitions seeking recognition of a political party, in a form to be prescribed by the Secretary of the State Election Board, shall be filed with said Secretary, bearing the signatures of registered voters equal to at least five percent (5%) of the total votes cast in the last General Election either for Governor or for electors for President and Vice President. Each page of said petitions must contain the names of registered voters from a single county. Petitions may be

the petitions, and must file them no later than May 31 of an even-numbered year. *Id.* A party loses recognized status if its nominee for Governor or its nominees for electors for President and Vice President fail to receive at least ten percent of the total votes cast in any general election. *Id.* § 1–109. When a party loses recognized status, the party affiliation of those voters registered as members of that party is automatically changed to Independent. *Id.* § 1–110.

Oklahoma holds general elections every two years in the even-numbered years. The gubernatorial general election is held every four years, in the even-numbered year on which the presidental election is not held. The gubernatorial and presidential general elections thus alternate every two years. As a result, the number of signatures required for recognized status in a presidential election is based on the gubernatorial turnout, while the signatures required for a gubernatorial election is determined by the presidential turnout.

Since 1945, only two minority parties have successfully petitioned to gain recognized party status: the American Party in 1968, and the Libertarian Party in 1980.[4] No third party has successfully petitioned to gain recognized party status in Oklahoma for a gubernatorial election year since 1974 when the petition signature requirement was changed from 5,000 signatures to five percent of the votes cast in the preceding general election. *See* Okla. Stat. tit. 26, § 229 (1971), *repealed by* 1974 Okla.Sess.Laws Ch. 153, § 17–114.

## II.

Plaintiffs make a broad challenge to Okla.Stat. tit. 26, § 1–108. As described above, that statute requires a party seek-ing recognized status to obtain signatures equalling at least five percent of the number of votes cast in the last general election. Because the gubernatorial and presidential elections alternate every two years, the number of signatures required in a gubernatorial year is set by the preceding presidential general election, while the number in a presidential election year is established by the preceding gubernatorial election. It is undisputed that voter turnout has been consistently higher for presidential general elections than for gubernatorial general elections. Accordingly, more signatures are needed to satisfy the five percent requirement in a gubernatorial year than in a presidential year. Currently, it would take 45,497 signatures to meet the five percent requirement for forming a recognized political party in 1988. It would have taken 62,784 signatures in 1986. While plaintiffs do not contend that a five percent signature requirement is per se unconstitutional, they do assert that the disparity is constitutionally impermissible.

Plaintiffs begin their argument on this point by contending that we must apply strict scrutiny to state statutes restricting the ballot access of minority parties. We are unable to agree. Courts and commentators alike have pointed out that the Supreme Court has not been consistent in articulating the standard by which we are to evaluate the constitutionality of such statutes. *See, e.g., Hall v. Simcox,* 766 F.2d 1171, 1173 (7th Cir.), *cert. denied,* 474 U.S. 1006, 106 S.Ct. 528, 88 L.Ed.2d 459 (1985); *Dart v. Brown,* 717 F.2d 1491, 1501–04 (5th Cir.1983), *cert. denied,* 469 U.S. 825, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984); *Arutunoff v. Oklahoma State Election Bd.,* 687 F.2d 1375, 1379 (10th Cir.1982), *cert. denied,* 461 U.S. 913, 103

circulated a maximum of one (1) year after notice is filed, provided that petitions shall be filed with said Secretary no later than May 31 of an even-numbered year. Said petitions shall not be circulated between May 31 and November 15 of any even-numbered year.

"3. Within thirty (30) days after receipt of said petitions, the State Election Board shall determine the sufficiency of said petitions. If said Board determines there are a sufficient number of valid signatures of registered vot-ers, the party becomes recognized under the laws of the State of Oklahoma with all rights and obligations accruing thereto."

**4.** The Libertarian Party lost its recognized status when its candidate received only 1.2% of the total votes cast for President in the 1980 general election. *See Arutonoff v. Oklahoma State Election Bd.,* 687 F.2d 1375, 1377 (10th Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983).

S.Ct. 1892, 77 L.Ed.2d 282 (1983); L. Tribe, *American Constitutional Law* § 13–20, at 1107–10 (2d ed. 1988). In *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979), the Court, in evaluating an equal protection challenge to a ballot access restriction, did require the state to establish a compelling interest and to use the least drastic means to achieve its goal. However, other and more recent Supreme Court cases have neither demanded a compelling state interest nor insisted that the state demonstrate it has achieved this end by the least restrictive means available. *See Munro v. Socialist Workers Party*, — U.S. ——, 107 S.Ct. 533, 538–39, 93 L.Ed.2d 499 (1986);[5] *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983); *see generally* L. Tribe, § 13–20, at 1107–10.

In two recent ballot access cases in this circuit, *Populist Party v. Herschler*, 746 F.2d 656, 659 (10th Cir.1984), and *Blomquist v. Thomson*, 739 F.2d 525, 527 (10th Cir.1984), we applied the analytical process set out by the Court in *Anderson*, 460 U.S. at 789, 103 S.Ct. at 1570, 75 L.Ed.2d 547 (1983), under which a court

> "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional."

Accordingly, this balancing test governs our determination here.

State statutes that restrict "the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively." *Munro*, 107 S.Ct. at 536. These important associational rights are nonetheless subject to state limitation. The Supreme Court has held that a state has an important interest "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 537 (quoting *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971)).

The district court in this case recognized the importance of the associational rights involved and the importance of the state's need to require minority parties to demonstrate a modicum of support. The court pointed out that both the Supreme Court and this circuit have upheld election laws restricting ballot access to candidates who file petitions containing signatures equal to five percent of the voters in the last general election, citing *Jenness v. Fortson*, 403 U.S. 431, 438, 91 S.Ct. 1970, 1974, 29 L.Ed. 2d 554 (1971), and *Populist Party v. Herschler*, 746 F.2d 656, 660 (10th Cir.1984). The court concluded that because the five percent requirement is itself constitutionally acceptable, the fact that it results in a signature requirement that fluctuates between gubernatorial and presidential elections is not constitutionally significant.

On appeal, plaintiffs contend that the district court did not address the rationale for their claim that the five percent requirement is unconstitutional as it operates in the Oklahoma election process. Although plaintiffs have not articulated their position very clearly, we understand them to assert that because Oklahoma has in effect conceded that its interest is satisfied by restricting ballot access to those parties that receive five percent of the historically lower turnout in gubernatorial elections, the State cannot justify the alternatively

---

**5.** Indeed, the dissent in *Munro* castigates the majority for failing to use the strict scrutiny standard. *Munro*, 107 S.Ct. at 540–41 (Marshall, J., dissenting).

higher requirement that results from using the turnout in a presidential year. In so doing, plaintiffs are apparently attempting to bring the circumstances here within the holding of *Illinois State Bd.*, 440 U.S. at 173, 99 S.Ct. at 983. We do not find that case sufficiently analogous to be helpful to plaintiffs.

In *Illinois State Bd.*, the state had imposed a 25,000 signature requirement upon minority parties and independent candidates who wished to appear on the ballot in statewide elections. However, minority parties and independent candidates who wished to run for local office were required to obtain signatures equalling five percent of the number of voters casting ballots in the previous local election. As a result of imposing two different standards, those candidates wishing to run for local office in Chicago needed substantially more signatures than a similarly situated candidate for statewide office. It is significant that in invalidating the more stringent requirement for local office, the Court pointed out that the state had offered no reason for the disparity in treatment, and that the anomaly was the result of historical accident. *Id.* at 186–87, 99 S.Ct. at 991.

▆ In the instant case, to the contrary, the Board asserts that the five percent signature requirement is based on voter turnout at the previous general election because that is the most recent gauge of those voters who are politically interested and therefore most likely to sign a new party petition. The state's reason for structuring its signature requirement as it has is legitimate, and the five percent requirement itself is undeniably constitutional. Recent Supreme Court authority does not demand more. *See Munro*, 107 S.Ct. at 538. Moreover, in view of the Supreme Court's treatment of an analogous argument in *Munro*, 107 S.Ct. at 539,[6] we do not believe the Court would attach constitutional significance to the fact that the number of signatures representing five percent

fluctuates on the basis of voter interest, as represented by voter turnout. "States are not burdened with a constitutional imperative to reduce voter apathy...." *Id.* We must therefore reject plaintiffs' argument that Oklahoma's signature requirement is unconstitutional.

### III.

▆ Plaintiffs assert that the May 31 deadline for filing petitions seeking recognized party status is so early in the election year process that it imposes an unconstitutional burden on their access to the ballot when it is considered in conjunction with the signature requirement of five percent. They argue that the combination of the early filing deadline and the high signature requirement makes Oklahoma's ballot access procedure one of the most restrictive in the country. This court has recognized that the fundamental rights to vote effectively and to associate are significantly burdened by an early deadline because it "prevents a new party from seeking support at a time when such support is most likely to crystallize—after the established parties have put forth their candidates and platforms." *Blomquist*, 739 F.2d at 528; *see also Herschler*, 746 F.2d at 661; *cf. Anderson*, 460 U.S. at 790–92, 103 S.Ct. at 1570–71 (independent presidential candidacy). Thus, we must carefully examine the legitimacy, strength, and necessity of the state's interest in setting a relatively early filing date.

The Board contends that the May 31 deadline is mandated by the Oklahoma election schedule. The Board is required by statute to determine the sufficiency of petitions in support of recognized party status within thirty days of the deadline, or by June 31. Okla.Stat. tit. 26, § 1–108. Candidates of recognized parties must file their declarations of intent to run in the primary during a two-day period beginning the first Monday after the Fourth of July. *Id.*

---

6. Plaintiffs pointed out in *Munro* that voter turnout at primary elections is lower than at general elections. As a consequence, they argued, requiring minority party candidates to obtain 1% of the vote in the primary election in order to be in the general election is too restrictive because the pool of potential supporters has been reduced. The Court was not persuaded that this argument was constitutionally significant.

§ 5–110. The primary elections are held the fourth Tuesday in August. Oklahoma has a closed primary, *id.* § 1–104, and all recognized political parties in Oklahoma are required to use the primary election to choose their nominees for the offices at issue in the general election.[7] *Id.* § 1–102. If no party candidate for an office receives a majority of the votes cast for that office in the primary, a runoff primary is held on the third Tuesday of September. *Id.* § 1–103. The general election is held the first Tuesday after the first Monday in November. *Id.* § 1–101.

The Board argues that the May 31 deadline is necessary to provide enough time for it to verify the petitions before the primary candidate filing period. The Board further asserts that the length of time between the primary candidate filing deadline and the primary election is necessary to allow challenges to the candidates under Okla.Stat. tit. 26, § 5–118. The Board contends that such challenges protect other candidates and the voting public by helping ensure that only qualified candidates appear on the ballot. It also asserts that the time allotted between elections is necessary to administer recounts, to enable judicial resolution of election challenges on the basis of fraud, to print ballots, and to mail out and receive absentee ballots.

The Supreme Court has acknowledged "that some cut off period is necessary ... to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges." *American Party v. White*, 415 U.S. 767, 787 n. 18, 94 S.Ct. 1296, 1309 n. 18, 39 L.Ed.2d 744 (1974). Our resolution of the deadline issue here may well be mandated by the Supreme Court's decision in *Jenness*, 403 U.S. at 431, 91 S.Ct. at 1970. There the Court held that a filing deadline of the second Wednesday in June was not "unreasonably early," *id.* at 438, 91 S.Ct. at 1974, even when it operated in a scheme that was otherwise more restrictive in many respects than the one at issue here. In *Jenness*, minority party candidates were required to obtain signatures equalling five percent of the number of *registered* voters in the last election, a number relatively higher than the five percent of *actual* voters required by Oklahoma. *See id.* at 432, 91 S.Ct. at 1971; *see also Hall*, 766 F.2d at 1173–74 (pointing out that pool of registered voters is larger than pool of actual voters). Moreover, in *Jenness* minority parties had only 180 days to circulate petitions, as opposed to the one-year period provided in Oklahoma. We see no principled way to distinguish the circumstances approved in *Jenness* from the circumstances before us.[8] Here, as in *Jenness*, the state

"imposes no suffocating restrictions whatever upon the free circulation of nominating petitions. A voter may sign

---

7. Plaintiffs do not mount a direct constitutional challenge to Oklahoma's requirement that minority parties, as well as major political parties, select their party nominees by primary election rather than by party convention. However, plaintiffs do argue in passing that the state has no legitimate reason for requiring a minority party to select its candidates by primary rather than by convention, and that the filing deadline could be pushed back if minority parties did not have to participate in the primary. The Board responds that it has a substantial interest, as set out both by statute, Okla.Stat. tit. 26, § 1–102, and in the State Constitution, Okla. Const. Art. III, § 3, in a candidate selection system that is open to public scrutiny.

We need not decide this issue because it is not squarely before us. However, the Supreme Court has pointed out "that the State may limit each political party to one candidate for each office on the ballot and may insist that intraparty competition be settled before the general elec-

tion by primary election or by party convention." *American Party v. White*, 415 U.S. 767, 781, 94 S.Ct. 1296, 1306, 39 L.Ed.2d 744 (1974). The Court stated that although the primary and convention "procedures are different, ... the Equal Protection Clause does not necessarily forbid the one in preference to the other." *Id.* at 781–82, 94 S.Ct. at 1306. *See also Munro*, 107 S.Ct. at 535–36, 538 (state amended laws to require minority parties to participate in primaries).

8. We recognize that in *Jenness* the state permitted write-in votes, 403 U.S. at 438, 91 S.Ct. at 1974, while Oklahoma does not. However, we do not think that the lack of write-in votes is, as a practical matter, a significant distinction. *Accord Hall*, 766 F.2d at 1175; *cf. Anderson*, 460 U.S. at 799 n. 26, 103 S.Ct. at 1575 n. 26. This is particularly so when, as here, a minority party wishes to field a slate of candidates.

a petition even though he has signed others, and a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary. The signer of a petition is not required to state that he intends to vote for that candidate at the election. A person who has previously voted in a party primary is fully eligible to sign a petition, and so, on the other hand is a person who was not even registered at the time of the previous election. No signature on a nominating petition need be notarized."

*Jenness*, 403 U.S. at 438–39, 91 S.Ct. at 1974 (footnotes omitted).

We find no merit to plaintiffs' contention that the district court failed to properly consider the difficulty that the May 31 deadline poses for minority party petition drives. Plaintiffs presented undisputed evidence that voters lack interest in signing such petitions until after the major parties have held their conventions, picked their candidates, and established their platforms. However, lower courts are limited in the significance they can place on such evidence in view of the Supreme Court's approval of filing deadlines on dates before the major party conventions.[9] *See, e.g., American Party*, 415 U.S. at 787 n. 18, 94 S.Ct. at 1309 n. 18; *Jenness*, 403 U.S. at

---

**9.** We recognize that the Supreme Court did give such considerations dispositive weight in *Anderson*, 460 U.S. at 790–96, 103 S.Ct. at 1570–73. However, *Anderson* is distinguishable in several material respects. The deadline challenge there arose in the context of an independent candidacy for national office. The Court pointed out that

"in the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United States are the only elected officials who represent all the voters in the Nation. Moreover, the impact of the votes cast in each State is affected by the votes cast for the various candidates in other States. Thus in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries."

434, 438, 91 S.Ct. at 1972, 1974. Plaintiffs also refer to undisputed evidence that, as a result of the early deadline, their party "was plagued with lack of enthusiasm, discouragement, lack of volunteers, and lack of funds." Brief of Appellants at 32. But the Supreme Court pointedly observed that:

"A petition procedure may not always be a completely precise or satisfactory barometer of actual community support for a political party, but the Constitution has never required the states to do the impossible. Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with arguments that burdens like those imposed by [the State] are too onerous, especially where two of the original party plaintiffs themselves satisfied these requirements."

*American Party*, 415 U.S. at 787, 94 S.Ct. at 1309 (citations omitted). We are thus not at liberty to place dispositive constitutional weight on this evidence. We note, moreover, that the Libertarian Party did complete a successful petition drive in 1980 despite the early deadline. *See Arutunoff*, 687 F.2d at 1377.

*Id.* at 794–95, 103 S.Ct. at 1573 (footnotes omitted). In this connection, we note that Oklahoma has a separate statute governing ballot access for minority candidates for President which has a July 15 deadline and requires a petition signed by 3% of the total votes cast in the last election for President. Okla.Stat. tit. 26, § 10–101.2 (Supp.1987).

The Court has also explained that "the political party and the independent candidate approaches to political activity are entirely different.... A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office." *Storer v. Brown*, 415 U.S. 724, 745, 94 S.Ct. 1274, 1286, 39 L.Ed.2d 714 (1974). The state thus has a correspondingly greater interest in imposing restrictions to provide "assurance that the particular party designation has some meaning." *Libertarian Party v. Florida*, 710 F.2d 790, 795 (11th Cir.1983), *cert. denied*, 469 U.S. 831, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984).

In sum, although we agree with the district court's observation below that the deadline here is "troublesomely early", rec., vol. I, doc. 51, at 11, we conclude that under controlling Supreme Court authority, Oklahoma's May 31 filing deadline is not unconstitutional, even in conjunction with the relatively high signature requirement.

## IV.

Finally, we consider plaintiffs' contention that the Oklahoma election statutes are unconstitutional because they preclude members of nonrecognized political parties from designating their party affiliation on the voter registration rolls. *See* Okla.Stat. tit. 26, § 1–110, § 4–112. In *Baer v. Meyer*, 728 F.2d 471 (10th Cir.1984), we addressed a similar argument and pointed out that "under today's political realities, access to minimal information about political party affiliation is the key to successful political organization and campaigning. The advent of computers has made it possible for persons seeking particularlized support to use these party designations as ways of targeting and specializing campaign efforts." *Id.* at 475.

State statutes that preclude members of minority parties from indicating their party affiliation on the registration lists foreclose minority parties from using the lists to discover and target other members of their parties. Because this burden falls unequally on minority parties, thereby implicating First Amendment interests within the holding of *Anderson*, 460 U.S. at 793, 103 S.Ct. at 1572, we must carefully consider whether the state's interests are sufficient to justify it. The state has a substantial interest in preventing "the purely frivolous and insubstantial attempts to designate party affiliation on the registration form." *Baer*, 728 F.2d at 475. Also relevant is the administrative burden the state would bear in providing for the indication of minority party affiliation. *Id.*

In *Baer*, we observed that because the voter registration lists were computerized, permitting voters to designate their affiliation with either of the minority parties who were plaintiffs there would not require a substantial effort by the state. In balancing the associational interests at stake, the state's "broad latitude in controlling frivolous party registration of tiny fractional interests," *id.*, and the insignificant administrative burden, we concluded that the state had unnecessarily prohibited the designation of membership in the plaintiff parties. In so doing, however, we limited our holding to permit voter designation of only the two plaintiff minority parties, because only those parties had "succeeded in fielding candidates by the petition process so as to demonstrate some modicum of political organization and support." *Id.* at 476.

The district court applied the above factors to the instant case and concluded that, contrary to the situation in *Baer*, the administrative burden on the state that would result from permitting designation of minority party affiliation would not be merely nominal. It is undisputed that the voter registration rolls were computerized in only three Oklahoma counties at the time of the proceedings below. The Board presented uncontroverted evidence that as a result, the state's burden, although not insurmountable, would be substantial.

While an administrative burden in and of itself would not be sufficient to justify infringing important associational rights, we must consider it together with the state's interest in controlling party registration of tiny fractional interests. When we strike the balance here, we conclude that the state has not unnecessarily infringed upon the associational rights of the voter and his party by restricting party designation to those parties that have shown the modicum of support necessary to receive recognized status. Accordingly, we conclude that the challenged statutes are not unconstitutional.

AFFIRMED.