**LA PORTE COUNTY REPUBLICAN CENTRAL COMMITTEE, Charles W. Morgan, and Bart Lombard, Plaintiffs–Appellants,**

v.

**BOARD OF COMMISSIONERS OF THE COUNTY OF LA PORTE and La Porte County Election Board, Defendants–Appellees.**

No. 94–1954.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 5, 1994.

Decided Dec. 16, 1994.

James Bopp, Jr. (argued), John K. Abegg, Bopp, Coleson and Bostrom, Terre Haute, IN, for plaintiffs-appellants.

Eric F. Yandt, Shaw R. Friedman, Yandt & Friedman, La Porte, IN, Carmen M. Piasecki, Eugenia S. Schwartz (argued), Nickle & Piasecki, South Bend, IN, Greta S. Friedman, Boklund, Yandt & Friedman, La Porte, IN, for defendants-appellees.

Before POSNER, Chief Judge, and ENGEL * and EASTERBROOK, Circuit Judges.

* Hon. Albert J. Engel, of the Sixth Circuit, sitting by designation.

EASTERBROOK, Circuit Judge.

The legislature of La Porte County, Indiana, is a three-member Board of Commissioners. Although the County has three districts, all elections are held at large, for staggered four-year terms. The districts therefore affect only the residence of the Commissioners (each of whom must live in a different district); all residents of the County may vote for each of the three positions. Because voters may cast ballots for each position, the residence districts need not have identical (or even similar) populations. *Dallas County v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975); *Dusch v. Davis,* 387 U.S. 112, 87 S.Ct. 1554, 18 L.Ed.2d 656 (1967); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). While electoral districts must be reapportioned after each census, residence districts may stay the same indefinitely.

La Porte County nonetheless redrew the lines separating residence districts in 1987, 1991, and 1993. Each map has more filigree than its predecessor, with an arm of District 1 protruding into District 3, and a tentacle of District 3 winding through District 1. Nothing of the kind is necessary to equalize the population of the districts—and anyway no rule of law requires the County to do so. Plaintiffs believe that they know the reason for the protean cartography: the incumbent Commissioners' drive for self-preservation. The Board of Commissioners draws the maps. According to the complaint (whose allegations we must accept), the Board redrew the map in 1991 so that Stephen Wurster, who was planning to run for Commissioner from District 2, would find himself in District 3 facing a different opponent. The 1993 revisions had several purposes, leading to a more complex set of borders. The Board wanted to enable Marlow Harmon to run from District 1 rather than District 3, where the 1987 and 1991 maps placed him; it also wanted to prevent Charles W. Morgan and Henry J. Kintzele from running against Harmon, so the precincts where Morgan and Kintzele live were shifted to District 3. One "natural" way to accomplish all of these ends would have put Bart Lombard in District 1, but the Board did not want him as a candidate either, so the mapmaker's quill excised his precinct from the area being added to District 1. The upshot is that Morgan and Kintzele were knocked out of the election for the seat from District 1 in 1994 and must wait until 1996 to run for the post from District 3. Because the commissioners serve staggered terms (two elected in the years of Presidential elections, and one in the remaining even-numbered years), exclusion from the District 1 post being contested in 1994 was exclusion from an opportunity to run for the Board that year. The staggered terms also make it possible for the Board to draw a new map in 1995 putting Morgan and Kintzele back in District 1 and banishing them from the field eligible to contest the 1996 election. Morgan, Lombard, and the Republican Central Committee of La Porte County filed this suit under 42 U.S.C. § 1983, contending that the County Board's use of peripatetic boundaries violates the rights of both candidates and voters under the fourteenth amendment to the Constitution.

Plaintiffs argued in the district court that the 1993 map is a form of political gerrymandering, actionable under *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986). That did not impress the district judge, who dismissed the suit on the pleadings. 851 F.Supp. 340 (N.D.Ind.1994). It does not persuade us, either. *Davis* permits relief if and only if the "electoral system substantially disadvantages certain voters in their opportunity to influence the political process effectively. In this context, such a finding . . . must be supported by evidence of continued frustration of the will of a majority of voters or effective denial to a minority of voters of a fair chance to influence the political process." *Id.* at 133, 106 S.Ct. at 2810–11 (plurality opinion). Plaintiffs have not offered to prove that the districts in La Porte County have frustrated the will of a majority (or even a minority) of *voters,* for even one election. No surprise here; because La Porte County elects Commissioners at large, no voter or group could be frustrated by the location of the line separating one residence district from another. Only candidates could be affected. And although knocking out the voters' favorite candidate may shift the election to the other party, this did not happen in

1994: Jim Kruse, a Republican, defeated Harmon for the District 1 post. Plaintiffs have not offered to prove that the oscillation of district borders affected the balance between parties in earlier years. Kintzele, one of the three "victims" of the 1993 remapping, is a Democrat (as is Wurster, the loser in the 1991 alteration). A complaint may not be dismissed under Fed.R.Civ.P. 12(b)(6) just because it omits factual allegations, but it may be dismissed when the plaintiffs make it clear that they do not plan to prove an essential element of their case. E.g., *Sanjuan v. American Board of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 250–52 (7th Cir.1994).

Instead of seeking an opportunity to make a demonstration that would be acceptable to the plurality in *Davis*, plaintiffs ask us to disregard its criteria and adopt the view of Justice Powell, whose separate opinion in *Davis* treats as unconstitutional any redistricting "motivated solely by partisan considerations." 478 U.S. at 177, 106 S.Ct. at 2834 (Powell, J., concurring and dissenting). Yet the reason Justice Powell was *dissenting* is that seven members of the Court disapproved his views. The plurality (Justice White, joined by Brennan, Marshall & Blackmun, JJ.) adopted the approach we have quoted, and three other justices (Burger, C.J., and Rehnquist & O'Connor, JJ.) concluded that claims of political gerrymandering are not justiciable. When the Court spreads out along a spectrum, without a majority opinion, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds". *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell & Stevens, JJ.), adopted by a unanimous Court in *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). The plurality opinion in *Davis* fits the bill, and we must apply it.

Not that it is necessary to reconstruct a majority from the shards in *Davis*. As we have emphasized, that case is about gerrymandering of voting districts. Plaintiffs complain about the gerrymandering of residence districts. That subject reached the Court before *Davis*, and in *Dallas County v. Reese* the Court concluded that a challenge to the borders requires proof that "a plan in fact operates impermissibly to dilute the voting strength of an identifiable element of the voting population." 421 U.S. at 480, 95 S.Ct. at 1708. That formulation calls for the same sort of proof as does the plurality opinion in *Davis*.

■ As a "political gerrymandering" case, therefore, this suit is going nowhere. Just as a complaint need not plead facts, however, it also need not plead law, and it is not tied to one legal theory. *Bartholet v. Reishauer A.G. (Zürich)*, 953 F.2d 1073, 1078 (7th Cir.1992). Plaintiffs Morgan and Lombard allege that the County Board knocked them, personally, out of the 1994 race for political reasons, and given a generous reading the complaint also alleges that the Board has adopted a practice of manipulating the list of eligible persons to enhance its members' prospects for reelection. Rules curtailing eligibility to run for office may violate the Constitution even if they have nothing to do with the outcome—even if, for example, they exclude only candidates who are unlikely to prevail. See *Norman v. Reed*, 502 U.S. 279, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). La Porte County could not disestablish the Libertarian Party, or disqualify its candidates, just because no libertarian has been elected in a very long time. It may apply neutral criteria for access to the ballot, but these criteria must be justified by important public interests. Just *how* important is a subject open to debate, but shadings among "strict scrutiny," "compelling importance," and "important regulatory interests"—all of which find some support in recent cases, see *Burdick v. Takushi*, —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (collecting authority)—do not matter. Defendants do not argue that a desire to avoid challenge by the rivals most popular with the voters satisfies even the least demanding standard.

■ No one could doubt that a law reading "Charles W. Morgan is ineligible to run for the La Porte County Board" would violate the rights of both Morgan and the voters

who want him as their representative. A plan to move the border separating Districts 1 and 3 every two years, so that Morgan always lives in a district that does not elect a representative in that cycle, would fail for the same reason. Similarly, although a governmental body may require a candidate to gather enough signatures to show a modicum of political support, it could not change that level every two years immediately after seeing how much support had been garnered by the incumbents' most serious rival, always setting the minimum at 1% more than the rival obtained. Application of these principles does not depend on proof that the incumbents' machinations favor one political party (or other group) over another; the practices would be equally obnoxious if the Board knocked out a Jewish Republican in 1994, a female Democrat in 1996, and a black Libertarian in 1998.

What would be troubling—to us as well as to the majority in *Reese* and seven Justices (albeit in two groups) in *Davis*—is the prospect of judicial management of a process that is necessarily political. Every 10 years the census requires reapportionment of electoral districts, and it is impossible to exclude politics from the remapping. Even a compactness rule would not do so (for there are many ways to draw compact districts, with different winners and losers). Forbidding the political branches to think about who is likely to gain from one map rather than another would be a fool's errand. Mixed motives are inevitable. Attempting to banish thoughts of political advantage from the minds of incumbents would (if taken seriously) move all redistricting to the judiciary, where mortals wearing robes would indulge their own political views to some extent no matter how hard they sought to put such matters out of mind. No wonder the Court has insisted that political decisions be left in the main to the political (elected) branches of government rather than to the judiciary, even when the political decisions affect elections. *Davis*, 478 U.S. at 133–34, 106 S.Ct. at 2810–11 (plurality opinion), 144–46, 106 S.Ct. at 2816–17 (O'Connor, J., concurring); see also *Voinovich v. Quilter*, — U.S. —, —––—, 113 S.Ct. 1149, 1158–59, 122 L.Ed.2d 500 (1993); *Growe v. Emison*, — U.S. —, —, 113 S.Ct. 1075, 1081, 122 L.Ed.2d 388 (1993); *Chapman v. Meier*, 420 U.S. 1, 27, 95 S.Ct. 751, 766, 42 L.Ed.2d 766 (1975).

Given *Reese*, however, there is nothing inevitable about redrawing residence districts frequently. Political officials change these maps not because they *must* do so every decade, but because they *want* to do so. When they act, they need a valid reason. So far as this case is concerned, defendants redrew the map in 1993 for one reason and one reason only: to prevent three popular persons from standing for election. If that is indeed the only reason, the result should not be distinguished from a law disqualifying those three persons by name.

We appreciate the norm that legislative intent does not make an otherwise-proper law invalid. *United States v. O'Brien*, 391 U.S. 367, 383–84, 88 S.Ct. 1673, 1682–83, 20 L.Ed.2d 672 (1968); *Fletcher v. Peck*, 10 U.S. 87, 130–31, 3 L.Ed. 162 (1810). We assess the law and not the legislator. But the law is full of situations in which knowledge of intent is essential to understand and evaluate the law. E.g., *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). When the Constitution forbids the political branches to do something directly (for example, to disqualify blacks from public employment or to favor Episcopalian applicants for unemployment benefits), it becomes necessary to curtail the use of proxies—seemingly neutral criteria adopted only because they approximate a more desired (but strictly forbidden) scheme of classification. A motive to decide on racial or religious grounds leads the court to lump the "neutral" law with the discriminatory one. *Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, — U.S. —, —––—, 113 S.Ct. 2217, 2230–31, 124 L.Ed.2d 472 (1993); *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). This approach makes mixed-motive cases decidedly more complex than single-motive cases. We understand the complaint as offering to prove that striking a few names from the list of eligible candidates was not just *a* reason but the *only* reason for the changes of 1993, and we do not express an opinion on what happens if the evidence shows that the Board had legitimate reasons

for changing the map, and that the effect on these potential candidates was just a welcome byproduct. Cf. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979).

REVERSED AND REMANDED.