108 F.3d 768
 LIBERTARIAN PARTY OF ILLINOIS, Mike Ginsberg, R.W. Baruth,
Jr., Carrie Belt, Jeannette Clinkenbroomer, Greg Engstrom,
Robert H. Franke, Robert J. Johnston, Charles Melalitz, John
Nelson, Dan O'Connell, Paul Salander, Gale Teschendorf, Lyn
Tinsley, Anne Wagner, and Martin G. Yasus, Plaintiffs-Appellants,
v.
Wanda L. REDNOUR, Hannelore Huisman, Kenneth R. Boyle,
Judith A. Jones, Mitchell B. Kobelinski, David E. Murray,
Langdon D. Neal, and Theresa M. Petrone, in their Official
Capacities as Members of the Illinois State Board of
Elections, Defendants-Appellees.
 No. 96-1561.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 6, 1996.
Decided March 7, 1997.
 
 Gary Sinawski (argued), New York City, Andrew B. Spiegel, Wheaton, IL, for plaintiffs-appellants.
 Mary E. Welsh (argued), Officer of the Attorney General, Civil Appeals Division, Chicago, IL, for defendants-appellees.
 Before CUMMINGS, RIPPLE, and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 This case resolves whether certain provisions of the Illinois Election Code unconstitutionally impair the ability of a new political party to place its congressional candidates on the general election ballot. The plaintiffs-appellants consist of one entity and two groups of individuals: the Libertarian Party of Illinois (including its chairperson), seven candidates who sought the party's nomination for United States Representative in the Illinois March 1996 general primary election, and several voters who wanted to vote for these candidate-plaintiffs.[1] The LPI sued defendants-appellees-members of the Illinois State Board of Elections ("the Board")--in their official capacities, seeking declaratory and injunctive relief that would require the Board to include the Libertarian Party's congressional candidates on all primary election ballots across the state. The Board, however, successfully moved for summary judgment, thereby keeping the Libertarian candidates out of the primaries. Because we find that the Illinois ballot access requirements do not unconstitutionally impair the rights of the LPI, we affirm the decision of the district court.I. HISTORY
 
 
 2
 The Illinois Election Code sets forth instructions detailing when candidates from a political party may be placed on the ballot in state, local, and congressional elections. See 10 Ill.Comp.Stat. 5/1-5/30. In essence, the Code characterizes political parties in two categories: "established" and "new." If a party receives more than 5% of the vote in the last general election for governor, that party is considered an established political party for all state, local, and congressional races. 10 Ill.Comp.Stat. 5/10-2. If a party receives more than 5% of the vote in certain other statewide elections, e.g., United States Senate, Illinois Attorney General, or the University of Illinois Board of Trustees,[2] that party is considered established only for statewide elections, and not for congressional or other non-statewide elections. Id. Finally, a party that receives more than 5% of the vote in the last election within any congressional district or other political subdivision, e.g., United States House of Representatives, is considered an established political party only for that district. Id. A party remains established only as long as it maintains the above criteria. Id. Parties that are not established are considered new parties.
 
 
 3
 The distinction between established and new political parties is significant because it affects the nomination process by which candidates are ultimately placed on the general election ballot. In general, an established party nominates its candidates for the general election through a primary election. To appear on a primary election ballot, a candidate seeking an established party's nomination must submit a petition with signatures from 0.5% of the qualified primary electors. 10 Ill.Comp.Stat. 5/7-10. For the March 1996 primary election, Democratic congressional candidates needed to submit an average of 658 signatures, and Republican candidates needed to submit an average of 532 signatures.[3]
 
 
 4
 If a political party is not established in a particular political subdivision, and thus considered new, its candidates can gain access only to the general election ballot. A group forms a new political party by submitting a complete slate of candidates for all of the offices to be filled in that political subdivision, as well as a petition containing a specified number of signatures. 10 Ill.Comp.Stat. 5/10-2. If the new party is being formed for the entire state, the petition must contain signatures totaling the lesser of 25,000 or 1% of the voters in the last statewide general election. Id. If the new party is being formed only for a congressional district or other political subdivision, the petition must contain the lesser of 5% of the total number of voters in the district's last regular election or the number of signatures needed for statewide formation.[4] Id. In becoming a "new political party," a party gains the ability to place candidates on the next general election ballot for the offices to be voted on within the state or the particular political subdivision.[5] Id. Individual independent candidates must satisfy nearly identical nominating requirements to appear on the general election ballot. See 10 Ill.Comp.Stat. 5/10-3. In 1996, the average number of signatures needed by a new political party to place its congressional candidates on the general election ballot was 7,610, and the average number in the congressional districts of the seven candidate-plaintiffs was 9,337.
 
 
 5
 Heading into the 1996 primary and general elections, the Libertarian Party of Illinois was an established party for all statewide elections, and a new party for all congressional elections. The LPI was able to gain established party status for all statewide elections because three Libertarian candidates combined to capture 5.5% of the vote in the 1994 election of the University of Illinois Board of Trustees. The LPI, however, could not obtain established party status for all elections within the state--i.e., state, local, and congressional--because it received only 1.68% of the vote in the last governor's race, well below the 5% threshold. Moreover, because no Libertarian candidate captured more than 5% of the vote in any of the 1994 congressional races, the LPI was not established in those districts in 1996.
 
 
 6
 On December 18, 1995, ten LPI candidates[6] for the United States House of Representatives attempted to file nominating petitions for seven congressional districts in the March 1996 general primary election. The Board, however, refused to accept these petitions because the LPI was not an established party in any of those congressional districts. In fact, the petitions, which consisted only of a Statement of Candidacy and a single page of signatures, did not appear to contain an adequate number of signatures even for an established party's candidate.
 
 
 7
 The LPI subsequently brought suit against the Board under 42 U.S.C. § 1983, alleging that these ballot access requirements violated their rights under the First Amendment, the Fourteenth Amendment, and the Qualifications Clause of the United States Constitution. The LPI asked the district court to enjoin the Board, and require it to include its candidates on all congressional primary ballots across Illinois. The district court denied this request, and granted the Board's motion for summary judgment.
 
 II. ANALYSIS
 A. Standard of Review
 
 8
 We utilize a de novo standard of review in analyzing a district court's grant of summary judgment. Campbell v. Towse, 99 F.3d 820, 826 (7th Cir.1996). Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the party opposing the motion and draw all justifiable inferences in favor of that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513-14, 91 L.Ed.2d 202 (1986). However, neither "the mere existence of some alleged factual dispute between the parties," Anderson, 477 U.S. at 247, 106 S.Ct. at 2510, nor the demonstration of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), will sufficiently demonstrate a genuine issue of material fact. In that regard, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.[7]
 
 B. First and Fourteenth Amendments
 
 9
 The LPI complains that the nominating procedures applicable to "minor-established"[8] political parties--i.e., parties that are "established" for statewide elections and "new" for individual congressional elections--are unconstitutional because they unduly impair the access of candidates to the general election ballot for congressional (and other non-statewide) elections. Specifically, the LPI argues that Illinois violates the rights of its citizens to vote effectively and to associate for the advancement of political ideas. The Party asserts that the Illinois Election Code accomplishes this goal through two "intimately-related" ballot access regulations: one that requires "new" political parties to meet a 5% petitioning requirement in order to gain access to the general election ballot, and the other that prohibits so-called "minor-established" parties from nominating congressional candidates via primary elections.
 
 
 10
 The right to vote and the right to associate for political purposes remain two of the more fundamental rights present under our Constitution. These rights, however, are not absolute. Munro v. Socialist Workers Party, 479 U.S. 189, 193, 107 S.Ct. 533, 536, 93 L.Ed.2d 499 (1986). In addressing state ballot access laws, the Court has noted that such requirements
 
 
 11
 place burdens on two different, although overlapping, kinds of rights--the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms.
 
 
 12
 Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968); see also Illinois Bd. of Elections v. Socialist Workers Party, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979).
 
 
 13
 When reviewing challenges to a state's election laws, courts must weigh the " 'character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments ...' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule.' " Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 1570, 75 L.Ed.2d 547 (1983)). In applying this flexible standard, courts must also consider "the extent to which those interests make it necessary to burden the plaintiff's rights." Id. (quoting Anderson, 460 U.S. at 789, 103 S.Ct. at 1570). If the state subjects these rights to "severe" restrictions, the regulations must be "narrowly drawn to advance a state interest of compelling importance," Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992); see Socialist Workers Party, 440 U.S. at 184, 99 S.Ct. at 990. If the state imposes reasonable, nondiscriminatory restrictions on these rights, however, the state's important regulatory interests will generally be sufficient to justify the regulations. Burdick, 504 U.S. at 434, 112 S.Ct. at 2063-64.
 
 
 14
 In this case, the LPI asserts that the Illinois ballot access laws violate their constitutional rights to cast their votes effectively and to associate for the advancement of political ideas through the creation and development of a new political party.[9] The importance of these rights, which are derived from the First and Fourteenth Amendments, see Norman, 502 U.S. at 288, 112 S.Ct. at 704-05, cannot be denied. The Supreme Court has maintained that the "right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.' " Anderson, 460 U.S. at 787, 103 S.Ct. at 1569; accord Lubin v. Panish, 415 U.S. 709, 716, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974); Williams, 393 U.S. at 31, 89 S.Ct. at 10. The exclusion of candidates also impairs freedom of association, especially when considering the "effective platform" that election campaigns provide for rallying "like-minded citizens" behind various viewpoints on the salient issues of the day. Anderson, 460 U.S. at 787-88, 103 S.Ct. at 1569-70.
 
 
 15
 In response to LPI's asserted injury, the Board puts forth the following countervailing interests to justify the ballot access requirements: preventing ballot clutter, avoiding voter confusion, and requiring parties to demonstrate a significant modicum of public support before it has access to the ballot. The LPI, for good reason, does not dispute the importance of these interests.
 
 
 16
 The Supreme Court has long permitted states to impose various restrictions limiting a candidate's access to the ballot. States have not only an interest, but also a duty to ensure that the electoral process produces order rather than chaos. See Storer v. Brown, 415 U.S. 724, 729, 94 S.Ct. 1274, 1278-79, 39 L.Ed.2d 714 (1974); see also U.S. Const. art I, § 4, cl. 1 (providing that states may prescribe the time, place, and manner for holding congressional elections). Significantly, the Court has held that states have a vital and compelling interest in requiring "political parties appearing on the general ballot [to] demonstrate a significant, measurable quantum of community support." American Party of Texas v. White, 415 U.S. 767, 782 & n. 14, 94 S.Ct. 1296, 1307 & n. 14, 39 L.Ed.2d 744 (1974). This preliminary demonstration of a "significant modicum of support" furthers the state's legitimate interest of "avoiding confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971).
 
 
 17
 In that regard, the Court has "never required a State to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access." Munro, 479 U.S. at 194-95, 107 S.Ct. at 537. To demand otherwise would require a state's political system to sustain some damage before it could correct the problem, deprive state legislatures of the ability to show foresight in avoiding potential deficiencies, and inevitably lead to endless litigation regarding the sufficient amount of voter confusion and ballot overcrowding needed to warrant ballot access restrictions. Id. at 195-96, 107 S.Ct. at 537-38.
 
 
 18
 In two cases presenting facts strikingly similar to those before us, the Court ultimately determined that the states' important regulatory interests sufficiently justified their ballot access requirements. In Jenness, the Court held that Georgia did not abridge the speech and association rights of prospective candidates and registered voters via its two-pronged political association classification system. Georgia classified a "political party" as any political organization whose candidate had received at least 20% of the vote in the last gubernatorial or presidential election. Jenness, 403 U.S. at 433, 91 S.Ct. at 1971-72. The candidate of a "political party" could appear on the general election ballot only by winning a state-regulated primary election. Id. A "political body," on the other hand, was any political organization that did not meet the 20% threshold. Id. Candidates from a "political body" (or any other independent candidate) gained access to the general election ballot only by filing a nominating petition signed by at least 5% of the total number of voters eligible to vote in the last election for the relevant office. Id. The Jenness Court held that this system, with its 5% petitioning requirement, neither "freezes the status quo" of American political life, nor in any way "abridges the rights of free speech and association secured by the First and Fourteenth Amendments." Id. at 439, 440, 91 S.Ct. at 1975.
 
 
 19
 Later in Norman, the Court embraced its Jenness decision by upholding an Illinois election provision that required a candidate to obtain 5% of the vote or 25,000 petition signatures before it could run under an otherwise established political party's name within a particular voting district where that party was not yet established. Specifically, the Court sustained a law that ultimately required the Harold Washington Party to satisfy the 25,000 signature petition requirement for candidates vying for the suburban-district Cook County commissioner seats, even though it separately satisfied this requirement in the municipal district of the county and for countywide elections.[10] Norman, 502 U.S. at 295, 112 S.Ct. at 708-09. In that regard, the Court noted that "[j]ust as the State may not cite the Party's failure in the suburbs as reason for disqualifying its candidates in urban Cook County, neither may the Party cite its success in the city district as a sufficient condition for running candidates in the suburbs." Id.
 
 
 20
 As in Jenness and Norman, we find that the State's interests in this case are "sufficiently weighty to justify the limitation" upon LPI's rights. See Norman, 502 U.S. at 288-89, 112 S.Ct. at 705. Initially, we reject LPI's thin assertion that the ballot access restrictions are unduly severe. "[B]allot-access measures that result in any sort of disparate treatment" do not "automatically require[ ] strict scrutiny" analysis. Rockefeller v. Powers, 74 F.3d 1367, 1377 (2d Cir.1995), certs. denied, --- U.S. ----, ----, 116 S.Ct. 1703, 1704, 134 L.Ed.2d 802 (1996); see also id. at 1377-78 n. 16 (explaining cases that discuss this proposition). In light of Jenness, Norman, and several other cases, the LPI cannot argue that the 5% petitioning requirement is severe on its face. See e.g., American Party of Texas, 415 U.S. at 789, 94 S.Ct. at 1310 (requiring signatures that equal 3% or 5% of the vote is not facially invalid). The various freedoms available to new political parties in nominating its candidates and operating its affairs further demonstrates the rather minor burden imposed by the challenged regulations. For example, a new party may select its own slate of candidates via a party convention or otherwise; and unlike established parties, a new party is not required to participate in a primary election--a condition that the plaintiffs in Munro claimed was "qualitatively more restrictive than requiring signatures on a nominating petition." Munro, 479 U.S. at 197, 107 S.Ct. at 538. The Munro court ultimately rejected this argument, finding that the "differences between the two mechanisms [were not] of constitutional dimension." Id. Finally, the fact that two third-party candidates for United States Representative gained access to the 1994 Illinois general election ballot illustrates that the requirements do not pose an insurmountable obstacle to the LPI's access.[11] Because the restrictions here are not severe, we need not determine whether they are narrowly tailored to satisfy the State's compelling interests.
 
 
 21
 Rather, we need only determine whether Illinois has important interests that sufficiently justify the burden on LPI's rights. The crux of the LPI's claim is that the ballot access requirements irrationally and unnecessarily construct a "disparity between the nomination processes applicable to major and minor party candidates for non-statewide offices." This disparity, however, serves the State's important interest of ensuring that a political party that is new in a particular political subdivision demonstrates a modicum of public support before it can place its candidates on an election ballot. As in Jenness, the Illinois regulations merely permit the State to require new political parties to demonstrate a significant modicum of support via a 5% petitioning requirement in lieu of a primary election. Moreover, as in Norman--which LPI glaringly fails to distinguish-Illinois's 5% petition signature requirement for each congressional district advances the State's "separate" and "additional" interest of ensuring that the LPI demonstrate a significant modicum of support "in the particular electoral subdivision for which the candidate is nominated," Libertarian Party of Maine v. Diamond, 992 F.2d 365, 372 (1st Cir.1993) (citing Norman, 502 U.S. at 295, 112 S.Ct. at 708-09). Because the Illinois ballot access requirements are nearly identical to those in Jenness and Norman, and because they similarly further the State's important interests in a rational manner, we find that they do not unconstitutionally burden the LPI's First and Fourteenth Amendment rights.
 
 
 22
 In comparing the petitioning requirements for an "established" party's candidate in a primary election and a "new" party's candidate in a general election, the LPI attempts to compare apples with oranges. It is true that the candidates for Congress from an established party need only meet a .5% petitioning requirement (to appear on the primary ballot), and the candidates from a new party need to satisfy a 5% petitioning requirement (to appear on the general ballot). An uncritical glance at these numbers would lead one to believe that an established party needs to satisfy a much easier requirement in order to appear on the ballot. Unlike an established party, however, a new party has not yet demonstrated a significant modicum of support. The established party has already jumped the hurdle of demonstrating its public support by receiving 5% of the vote in the last congressional (or gubernatorial) election. Thus, it is neither irrational nor unfair to require a candidate from a new party to obtain a greater percentage of petition signatures to appear on the general election ballot than a candidate from an established party for the primary election ballot. The two petitioning requirements contain different percentages because they are used at two different times for two different purposes.[12]
 
 
 23
 Nor is it irrational for the State to grant established party status for both statewide and non-statewide elections based on the results from a gubernatorial election rather than another election, such as the election for the University of Illinois Board of Trustees. The Illinois governor's race traditionally draws the highest number of voters; thus, the ability of a single candidate to obtain 5% of these votes demonstrates significant support throughout the state. The Libertarian candidates' ability to obtain 5.5% of the vote (by combining the votes from three candidates) in the Board of Trustees race simply does not suggest a similar modicum of support. This point is further evidenced by the fact that the Libertarian candidate received only 1.68% of the vote in the last gubernatorial election--barely a whisper of statewide endorsement. In that regard, we note the subtle irony in the LPI's complaint; if anything, the party benefited greatly from Illinois's liberal policy of allowing a party to combine the votes from three candidates in the rather unexciting Board of Trustees election in order to obtain established party status for future statewide elections, including those for governor, attorney general, and the United States Senate.
 
 C. Qualifications Clause
 
 24
 The candidate-plaintiffs in this case also contend that the Illinois ballot requirements violate the Qualifications Clause of the United States Constitution because they are "substantive qualifications masquerading as mere ballot access restrictions." The candidate-plaintiffs claim that because the Illinois Election Code prohibits them from being nominated in a primary election and requires them to meet an extraordinarily high petitioning requirement, it excludes minor-party candidates, as a class, from seeking federal public office. We find this position untenable.
 
 
 25
 The Qualifications Clause provides the age, citizenship, and residency requirements necessary for a person to become a congressional representative. U.S. Const. art I, § 2. The Supreme Court has held that neither Congress nor any state may impose additional qualifications or alter the existing ones. See U.S. Term Limits, Inc. v. Thornton, 514 U.S. 779, ----, ----, 115 S.Ct. 1842, 1854, 1871, 131 L.Ed.2d 881 (1995) (holding that the State of Arkansas could not prohibit otherwise-eligible candidates from appearing on the general election ballot merely because they had already served a specified number of terms in office); Powell v. McCormack, 395 U.S. 486, 550, 89 S.Ct. 1944, 1979, 23 L.Ed.2d 491 (1969) (holding that the House of Representatives could not exclude any duly elected member that otherwise satisfies the constitutional requirements).
 
 
 26
 In Term Limits, however, the Court reasoned that where requirements are procedural in nature and do not add substantive qualifications, they do not violate the Qualifications Clause. Term Limits, 514 U.S. at ----, 115 S.Ct. at 1870. In that regard, states are entitled, under the Elections Clause,[13] to adopt "generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself." Id. (quoting Anderson, 460 U.S. at 788 n. 9, 103 S.Ct. at 1570 n. 9).
 
 
 27
 Unlike the substantive qualifications in Term Limits, the ballot access requirements imposed by the Illinois Election Code are entirely procedural. See id. (distinguishing the provisions in Storer and other Election Clause cases, which were found constitutional, "because they regulated election procedures and did not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position"); see also Storer, 415 U.S. at 730-33, 94 S.Ct. at 1279-81 (rejecting challenge to California's petition signature requirement). As explained above, these procedural requirements merely assure that candidates meet a minimum threshold of voter support in order to maintain the integrity and regularity of the electoral process. They do not pose a substantive handicap that systematically excludes the Libertarian candidates from office.
 
 
 28
 The LPI cites Term Limits for the proposition that the Illinois restrictions are contrary to the "fundamental principle of our representative democracy ... 'that the people should choose whom they please to govern them.' " Term Limits, 514 U.S. at ----, 115 S.Ct. at 1850 (quoting Powell, 395 U.S. at 547, 89 S.Ct. at 1977, in turn quoting 2 Elliot's Debates 257 (A. Hamilton, New York)). In doing so, however, the LPI puts the wrong spin on the right idea. The citizens of Illinois should, and indeed do choose their public officials; the Illinois ballot access requirements merely require candidates, such as the Libertarian congressional candidates here, preliminarily to demonstrate a minimum level of public support so that the citizens can choose their public officials in an orderly electoral process.
 
 
 29
 The decision of the district court is hereby AFFIRMED.
 
 
 
 [1]
 This opinion will collectively refer to plaintiffs-appellants as the "LPI" unless the individual categories of plaintiffs are otherwise relevant
 
 
 [2]
 As of January 1, 1996, the University of Illinois Trustees are appointed, not elected. See generally Tully v. Edgar, 171 Ill.2d 297, 215 Ill.Dec. 646, 664 N.E.2d 43 (1996)
 
 
 [3]
 Although not at issue here, the Illinois Election Code requires established party candidates to obtain 600 signatures following decennial congressional redistricting. 10 Ill.Comp.Stat. 5/7-10
 
 
 [4]
 Following congressional redistricting, 5,000 signatures are required. 10 Ill.Comp.Stat. 5/10-2
 
 
 [5]
 A new political party also has the ability to fill vacancies in nomination pursuant to 10 Ill.Comp.Stat. 5/10-11. See 10 Ill.Comp.Stat. 5/10-2
 
 
 [6]
 Seven of these candidates are the following candidate-plaintiffs: Clinkenbroomer, Engstrom, Franke, Salander, Teschendorf, Tinsley, and Yasus
 
 
 [7]
 We note that even though the November 1996 election is over, this controversy is not moot because it falls under the category of election cases that are "capable of repetition, yet evading review." See Norman v. Reed, 502 U.S. 279, 288, 112 S.Ct. 698, 705, 116 L.Ed.2d 711 (1992)
 
 
 [8]
 The LPI, not the Illinois Election Code, provides the characterization of political parties as either "major" or "minor" established parties. The Code classifies political parties as either "established" or "new" within a particular political subdivision. Presently, the Democratic and Republican parties are established for statewide and non-statewide elections as a result of their performances in the last gubernatorial election. The LPI did not become established in this way; it obtained its established status only for statewide elections by virtue of the combined performance of three of its candidates in the election for the University of Illinois Board of Trustees. Thus, although the LPI refers to itself as a "minor-established" party, it cannot change the fact that it is a "new" party for every congressional district within the state
 
 
 [9]
 The LPI does not appear specifically to allege a separate equal protection violation. In Anderson, the Supreme Court based its analysis on a general application of the First and Fourteenth Amendments when reviewing the constitutionality of ballot access regulations. See Anderson, 460 U.S. at 786 n. 7, 103 S.Ct. at 1569 n. 7. That decision, however, also relied upon the analysis of several election cases involving the Equal Protection Clause of the Fourteenth Amendment. Id
 
 
 [10]
 We note, however, that the Court also determined that the State could not disqualify the Harold Washington Party's entire slate of candidates in Cook County, including its municipal and county-wide candidates, based on the fact that it failed to collect enough petition signatures in the suburban district. See Norman, 502 U.S. at 291-94, 112 S.Ct. at 706-08
 
 
 [11]
 In addition, six such candidates were on the ballot in 1992 (when access to the ballot required only 5,000 signatures due to the decennial redistricting exception), two in 1990, and one in each of the years 1988, 1986, and 1984
 Moreover, in the November 5, 1996 general election (the day before oral argument), fourteen third-party candidates (including ten Libertarians) had access to the ballot. The LPI, however, argues that this number is irrelevant because these candidates did not submit nominating petitions containing the full amount of signatures; rather, they submitted a single page of signatures, recognizing that petitions are accepted by the state as presumptively valid unless challenged.
 
 
 [12]
 The purpose of the two petitioning requirements differ from each other in at least one other way. The .5% requirement that an established party's candidate must meet in order to gain access to the primary ballot provides only that candidate with access to the ballot. In contrast, when a new party meets the 5% petitioning requirement it gains access for all of its candidates within that particular political subdivision. See 10 Ill.Comp.Stat. 5/10-2
 
 
 [13]
 This clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators." U.S. Const. art. I, § 4, cl. 1