**IN THE**

**UNITED STATES COURT OF APPEALS**
**FOR THE SEVENTH CIRCUIT**

_____

No. 08–3218

ALLAN J. STEVO,

*Plaintiff-Appellant*,

v.

JOHN R. KEITH, *et al.*, in their capacities as members of the
  Illinois State Board of Elections,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Central District of Illinois.
No. 08–3162—**Richard Mills**, *Judge*.

_____

Argued September 25, 2008—Decided October 1, 2008[*]

_____

Before CUDAHY, POSNER, and FLAUM, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiff wants to run as an inde-
pendent candidate for the U.S. House of Representatives from
Illinois's Tenth Congressional District, which encompasses
parts of Lake and Cook Counties. His petition to appear on the
November 2008 general election ballot was challenged by a lo-

---

[*] The opinion is being released in typescript. A printed version will appear in
due course.

cal resident because the plaintiff had failed to submit with his petition the requisite minimum number of signatures of persons qualified to vote in the election. That number is 5 percent of the number of people who voted in the district in the last congressional election. 10 ILCS 5/10–3. For the Tenth Congressional District, the minimum required number of valid signatures is 10,285, and the plaintiff claims that he had more than 7,200. The Illinois State Board of Elections ruled that he had only 6,978 valid signatures; in any event he does not claim that his "more than 7,200" reached 10,285.

The plaintiff claims that the 5 percent requirement denies equal protection of the laws and infringes First Amendment rights to stand for public office and to vote for the candidate of one's choice. *Jenness v. Fortson*, 403 U.S. 431, 434 (1971); *Bullock v. Carter*, 405 U.S. 134, 143 (1972); James A. Gardner, "Deliberation or Tabulation? The Self-Undermining Constitutional Architecture of Election Campaigns," 54 *Buff. L. Rev.* 1413, 1432 (2007). A candidate denied a place on the Illinois ballot can, it is true, conduct a write-in campaign. "State of Illinois Candidate's Guide 2008" 41 www.elections.il.gov/Downloads/ElectionInformation/PDF/08CanGuide.pdf (visited Sept. 30, 2008). But that is an inferior alternative to having one's name on the ballot. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 830–31 (1995); *Lubin v. Panish*, 415 U.S. 709, 719 n. 5 (1974).

The district court dismissed the complaint for failure to state a claim. The appeal relies mainly on equal protection; the First Amendment claim is not developed.

All congressional districts must be redistricted after each decennial census. *Georgia v. Ashcroft*, 539 U.S. 461, 488 n. 2 (2003); Ill. Const. art. IV § 3; 10 ILCS 76/1–76/99; Adam Cox, "Partisan Fairness and Redistricting Politics," 79 *N.Y.U. L. Rev.* 751, 752–53 (2004). And for the first election after the decennial census Illinois requires independent candidates to obtain only

5,000 valid signatures from qualified voters, rather than the 5 percent required in the other elections. 10 ILCS 5/10–3; *Libertarian Party v. Rednour*, 108 F.3d 768, 771 (7th Cir. 1997). In one congressional district, the Fourth, 5,000 is more than 5 percent of the voters in the last (2006) congressional election (5 percent in that district is only 4,293), but in the others it is less and in the Tenth Congressional District, with its requirement of 10,285 signatures, 5,000 is less than half of 5 percent of the votes cast in the last election.

The average number of required signatures per district is 9,442. The Fourth, with only 4,293, is an outlier; the next lowest is the Fifth, with 7,713. The highest is the Nineteenth, with 12,205. (These figures are computed from "Signature Requirements and Forms—U.S. Representative in Congress," www.elections.state.il.us/Downloads/ElectionInformation/PDF/ usrep.pdf (visited Sept. 30, 2008).) Although the Supreme Court's reapportionment jurisdiction requires that congressional districts be of equal population, *Karcher v. Daggett*, 462 U.S. 725, 730–31 (1983); *Wesberry v. Sanders*, 376 U.S. 1, 17–18 (1964), the 5 percent rule produces different numbers in different districts without violating the Constitution because it is 5 percent of the number of persons who actually voted in a district, not 5 percent of the district's population.

The last decennial census was in 2000, and no Illinois congressional district was redistricted after the most recent congressional election, held in 2006. But the plaintiff argues that there is no difference between a newly redistricted district and a district that is unchanged since the last election, and therefore the state's judgment that 5,000 signatures is enough in a newly redistricted district proves that 5 percent is too stringent a requirement in *any* district in which the 5 percent formula yields a requirement of more than 5,000 signatures, such as the Tenth.

The Supreme Court has held that 5 percent is a permissible minimum signature requirement for placing third-party or in-

dependent candidates on the ballot, *Jenness v. Fortson, supra*, 403 U.S. at 439–41; *Nader v. Keith*, 385 F.3d 729, 733 (7th Cir. 2004), provided that there is not only a write-in alternative but also other means of getting one's candidacy before the electorate, such as finding sponsorship by a political organization, *Jenness v. Fortson, supra*, 403 U.S. at 438; *Hall v. Simcox*, 766 F.2d 1171, 1174 (7th Cir. 1985), and provided also that the state does not impose "suffocating restrictions" on ballot access. *Jenness v. Fortson, supra*, 403 U.S. at 438. Illinois does not. See *Nader v. Keith, supra*, 385 F.3d at 734–35; 10 ILCS 5/10–6, 5/10–8 to 5/10–10. But the plaintiff argues that Illinois's disparate treatment of the two types of district shows that a 5 percent minimum is arbitrary, at least in Illinois. He is using the 5,000-signatures provision of the law just to show that if it is good enough in newly redistricted districts, it is good enough in all districts.

The state defends the disparity in treatment between the two types of district on the ground that it is impossible to calculate a percentage of the votes in the previous election in a redistricted district because by definition there was no previous election in that district—the district didn't exist. But vote totals are reported for each precinct, and, if a district's boundaries are changed, the votes cast in the previous election in the precincts within the new boundaries can be added up and the sum will be the total number of votes that were cast in that area in the last election. Indiana does that in determining, when a district is redistricted, the number of votes that was cast in the last election in the area embraced by the new district; that number is then multiplied by the required percentage of valid signatures to determine whether the candidate has the signatures of enough qualified voters to get on the ballot. See Indiana Code §§ 3–8–6–3(a), 12(b)(7), (c), (d).

But this suit fails even if Indiana's procedure for determining the previous turnout in the area enclosed by new district boundaries is entirely feasible (as we'll assume, though district

boundaries sometimes slice through precincts and the turnout in each slice could not be determined with precision or perhaps at all). Redistricting is a disorienting event for voters and candidates alike, since it changes the electorate, usually with an eye to improving the electoral prospects of the majority party in the legislature doing the redistricting. *Gaffney v. Cummings*, 412 U.S. 735, 753–54 (1973); *Shaw v. Reno*, 509 U.S. 630, 661 (1993) (White, J., dissenting); *La Porte County Republican Central Committee v. Board of Commissioners*, 43 F.3d 1126, 1130 (7th Cir. 1994). Candidates and voters alike must adjust to the new political landscape. It is plausible that it would be more difficult for candidates to obtain signatures in such circumstances, and so the required number is reduced.

The method that Illinois uses to reduce the required number is crude, however, because districts vary in the number of people who voted in the last election. Hence the anomaly of the district in which the requirement of 5,000 signatures is more demanding than the 5 percent requirement, making it more difficult for candidates to obtain the required number of signatures in election years in which the district has been redistricted even though the objective of requiring "only" 5,000 signatures in new districts is to make the process of qualifying for a place on the ballot less difficult (albeit it is more difficult in only that one district). But the plaintiff's proposal—a requirement in every election of just 5,000 signatures—is as or more arbitrary, since, other things being equal, it is easier to obtain a specified number of signatures the larger the turnout in the district in the preceding election, and hence the smaller the percentage of qualified voters whom the candidate is required to sign up to reach the minimum number and so get onto the ballot. There are more fish in the pond, so it is easier to catch the required number.

Granted, other things may not be equal. The more signatures that are required, the greater the cost, and the difference

may be important for a minor-party or independent candidate. *Hall v. Simcox, supra*, 766 F.2d at 1174. But at best this point makes the choice between number and percentage a standoff; it does not justify invalidating the percentage approach.

Suppose the Indiana approach, whereby disaggregation of votes to the precinct level in the preceding election enables the same percentage to be required in districts that have recently been redistricted and districts that have not been, is indeed a compellingly superior approach; nevertheless the plaintiff would not have standing to urge its adoption. The Indiana approach is a solution to the problem of determining previous voter turnout after a redistricting, and the Tenth Congressional District is not a newly redistricted district. So the plaintiff is forced to argue that a *uniform* rule requiring 5,000 signatures (or a slightly higher number, provided it is below the number of valid signatures he was able to obtain) is so far superior to the present system that the Constitution requires that it be substituted for it. That is wrong, given the disparity in voter turnout in the different districts. We have just seen that requiring a number rather than a percentage may well be a bad feature of Illinois's treatment of elections in recently redistricted districts; the plaintiff urges us to impose that quite possibly inferior method in all elections, rather than, as at present, in just the elections in newly redistricted districts.

We warned in *Crawford v. Marion County Election Board*, 472 F.3d 949, 954 (7th Cir. 2007), affirmed, 128 S. Ct. 1610 (2008), against federal judicial micromanagement of state regulation of elections. See also *Clingman v. Beaver*, 544 U.S. 581, 593 (2005); *Burdick v. Takushi*, 504 U.S. 428, 432–34 (1992); *Storer v. Brown*, 415 U.S. 724, 729–30 (1974). But the appeal in this case fails on a more basic level: the change the plaintiff asks us to make in the Illinois voting system might well make that system more arbitrary than it already is.

AFFIRMED.